4/24/25

Note: Envelope 1: Complaint
Count I
Envelope 2: Counts II - VIII
Relief
Declaration
Exhibits
Seal

Nani Love Buckingham
50205086
Federal Detention Center
Po Box 13900
Seattle, WA 98198

Dear Court Clerk,

FILED
LODGED
RECEIVED

MAIL

APR 30 2025

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
DEPUT
BY

Please find enclosed revised complaint for civil rights violations regarding transgender and gender dysphoria issues that I submitted to FDC Seatac legal Mail on 4/9/25. My complaint has been revised for clarity of facts and defendants' roles.

I don't know if my initial complaint can be disregarded and replaced with this version or not at this point.

I have also sworn a declaration under penalty of perjury that my complaint is true and correct.

I have not yet received any thing back yet regarding my 4/9/25 submission. Given that I am pro se and incarcerated, it is difficult for me to effectively and efficiently communicate with the court. Due to the urgent nature of my complaint, in the interest of time I am submitting this revision to FDC Seatac Legal Mail to be mailed on 4/24/25.

Thank you,

Rev. 3/19

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

Nani Love Buckingham 50205086
Plaintiff's full name and prisoner number

Plaintiff,

v.

Federal Bureau of Prisons,
et al.
See attached
Defendant's/defendants' full name(s)

Defendant(s).

(If you cannot fit all of the defendants' names in the space provided, please write "see attached" in the space above and attach additional sheets of paper, as necessary, with the full list of names. The names listed here must be identical to those in Section II. Do not include addresses here. **Individuals whose names are not included in this section will not be considered defendants in this action.**)

Case No. _____
(leave blank – for court staff only)

**PRISONER CIVIL RIGHTS COMPLAINT**

Jury Demand?
☑ Yes
☐ No

FILED
LODGED  MAIL
RECEIVED

APR 3 0 2025

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                    DEPUTY

## WARNINGS

1.    Do not use this form if you are challenging the validity of your criminal conviction or your criminal sentence. If you are challenging your conviction or sentence, or if you are seeking restoration of good-time credits that would shorten your sentence, you must file a Petition for Writ of Habeas Corpus. If you use this form to challenge your conviction or sentence, you risk having your claim dismissed. Separate forms are available for filing a habeas petition.

2.    Under the Prison Litigation Reform Act ("PLRA"), you are required to exhaust all remedies in your institution's grievance system that are available to you before filing suit. This generally means that you must file a grievance and, if it is denied, appeal it through all available levels of review. Your case may be dismissed if you fail to exhaust administrative remedies, unless the administrative grievance process was not "available" to you within the meaning of the PLRA. You are not required to plead or show that you have exhausted your claim in this complaint.

Page 1 of 9

3.    Please review your complaint carefully before filing. If your case is dismissed, it may affect your ability to file future civil actions while incarcerated without prepaying the full filing fee. Under the PLRA, a prisoner who has had three or more civil actions or appeals dismissed as frivolous, malicious, or for failure to state a claim cannot file a new action without first paying the full filing fee, unless the prisoner is in imminent danger of serious bodily injury.

4.    Under Federal Rule of Civil Procedure 5.2, papers filed with the court, including exhibits or attachments to a complaint, may not contain certain information, which must be modified as follows:

Do not include:
- a full social security number
- a full birth date
- the full name of a minor
- a complete financial account number

Instead, use:
→ the last four digits
→ the birth year
→ the minor's initials
→ the last four digits

5.    You may, but do not need to, send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint. Any documents you submit *must relate directly to the claims you raise in this lawsuit.* They will become part of the court record and *will not be returned to you.*

## I.    PLAINTIFF INFORMATION

Buckingham, Nani, L
Name (Last, First, MI)

Buckingham, Brian, P
Aliases/Former Names

50205086
Prisoner ID #

Federal Detention Center Seatac
Place of Detention

PO Box 13900
Institutional Address

King, Seattle          WA          98198
County, City          State          Zip Code

*Indicate your status:*

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee

☐ Convicted and sentenced state prisoner
☑ Convicted and sentenced federal prisoner

Page 2 of 9

## II.    DEFENDANT INFORMATION

*Please list the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint. Make sure that the defendant(s) listed below are identical to those contained in the caption on the first page of the complaint. Attach additional sheets of paper as necessary.*

Defendant 1:    Federal Bureau of Prisons
Name (Last, First)

Current Job Title

320 First Street, N.W.
Current Work Address

Washington          DC          20534
County, City        State       Zip Code

Defendant 2:    United States of America
Name (Last, First)

Current Job Title

1600 Pennsylvania Ave., N.W.
Current Work Address

Washington          DC          20500
County, City        State       Zip Code

Defendant 3:    Department of Justice
Name (Last, First)

Current Job Title

950 Pennsylvania Ave., N.W
Current Work Address

Washington          DC          20530
County, City        State       Zip Code

See attached for Defendants 4-28

Page 3 of 9

## III.   STATEMENT OF CLAIM(S)

*In this section, you must explain what you believe each defendant did to violate your civil rights, and if you know, identify the federal statutory or constitutional right you believe was violated.*

*If you believe the defendant(s) violated your civil rights in more than one way, explain each violation under a different count. For example, if you believe you received constitutionally inadequate medical care and your religious rights were substantially burdened, include one claim under "Count I" (i.e., medical) and the other claim under "Count II" (i.e., religion).*

*Number your paragraphs. For example, in Count I, paragraphs should be numbered 1.1, 1.2, 1.3, etc., and in Count II, paragraphs should be numbered 2.1, 2.2, 2.3, etc. The first two paragraphs of each Count have been numbered for you.*

*If you have more than three counts, attach additional pages and follow the same format for each count.*

*If you attach documents to support the facts of your claim(s), you <u>must</u> specify which portion of the document(s) (i.e., page and paragraph) you are relying on to support the specific fact(s) of your claim(s). <u>If you do not specify the portion of the supporting document(s), the Court may disregard your document(s)</u>.*

### COUNT I

*Identify the first right you believe was violated and by whom:*

1.1 My 8th Am. rights have been violated because I have been denied access to medically necessary cont.

*State the <u>facts</u> of your first claim below. Include all the facts you consider important. Be specific about dates, times, locations, and the names of the people involved. Describe exactly what each specific defendant did or failed to do that caused you injury or violated your rights, and include any other facts that show why you believe what happened was wrong. If you need additional space, you may attach extra sheets.*

1.2 See attached

*State with specificity the injury, harm, or damages you believe you suffered as a result of the events you described above in Count I. Continue to number your paragraphs.*

— Denial of my medically necessary GD treatment is causing me to feel hopeless, and I am having increasing urges to kill myself or perform self-surgery on my genitalia. I am losing the resiliency I had to resist these urges, I feel like I am being tortured every day by the pain this is causing me. See attached.

## COUNT II

*Identify the second right you believe was violated and by whom:*

2.1 The FBOP has violated my rights under Title II of the ADA by denying me access to medically necessary care based on my GD.

*State the facts of your second claim below. Include all the facts you consider important. Be specific about dates, times, locations, and the names of the people involved. Describe exactly what each specific defendant did or failed to do that caused you injury or violated your rights, and include any other facts that show why you believe what happened was wrong. If you need additional space, you may attach extra sheets.*

2.2 I am a transgender female AIC in the FBOP at federal Detention Center (FDC) Seatac. I have been incarcerated here since 2020. I have been diagnosed with GD, a disability protected under the ADA and RA. The defendants have denied me access to medically necessary care on the basis of my GD in deliberate indifference to my serious medical needs, despite the very high, ongoing, risk to my wellbeing, and despite the fact they provide such care to other inmates.

2.3 Generally, the same legal principles govern ADA and RA claims, so I have included relevant information in Counts II and III.
See continuation pages.

*State with specificity the injury, harm, or damages you believe you suffered as a result of the events you described above in Count II. Continue to number your paragraphs.*

My mental health, psychological wellbeing, and my ability to function have been severely damaged. I am in constant pain, I feel like I'm being tortured, and I am very close to killing myself to end my suffering. See Count I <u>1.147-148</u>

### COUNT III

*Identify the third right you believe was violated and by whom:*

3.1 The defendants have denied me access to medically necessary care because of my GD violating my rights under the RA Section 504

*State the facts of your third claim below. Include all the facts you consider important. Be specific about dates, times, locations, and the names of the people involved. Describe exactly what each specific defendant did or failed to do that caused you injury or violated your rights, and include any other facts that show why you believe what happened was wrong. If you need additional space, you may attach extra sheets.*

3.2 I am a transgender female AIC with GD in the FBOP Federal Detention center (FDC) Seatac. The defendants have been deliberately indifferent to my serious medical needs on the basis of my disability. They have denied my medically necessary care and accommodations solely on the basis

of my disability.

3.3 Please see Counts. I and II for the facts of this claim.

See attached continuation

*State with specificity the injury, harm, or damages you believe you suffered as a result of the events you described above in Count III. Continue to number your paragraphs.*

My mental health, psychological wellbeing, and my ability to function have been seriously damaged. I'm in constant emotional pain, I feel incredibly hopeless, and I am on the verge of suicide because of this. See Count I 1.147-148

## IV.    RELIEF

*State exactly what you want the Court to do for you. For example, you may be seeking money damages from an individual defendant, you may want the Court to order a defendant to do something or to stop doing something, or you may want both kinds of relief. Make no legal arguments. Cite no cases or statutes.*

I am asking for a TRO and preliminary injunction compelling
the FBOP to immediately resume my life-saving, medically
necessary treatment and accommodations, including all
previously prescribed GD treatments and accommodations
See continuation. See exhibit B (my life is at risk).

## V.    SIGNATURE

*By signing this complaint, you represent to the Court that you believe the facts alleged to be true to the best of your knowledge, that you believe those facts show a violation of law, and that you are not filing this complaint to harass another person or for any other improper purpose.*

4/24/25
Dated

Plaintiff's Signature

Page 9 of 9



FILED
LODGED
RECEIVED

MAIL

APR 3 0 2025

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

BY                    DEPUTY

Defendant 4    Trump, Donald
USA President
1600 Pennsylvania Ave., N.W.
Washington, DC 20500

Defendant 5    Bondi, Pam
U.S. Attorney General
1600 Pennsylvania Ave, N.W.
Washington, DC 20500

Defendant 6    Doe 1, John
        Director, Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534

Defendant 7    Doe 2, John    Medical Director, FBOP
320 First Street, N.W.
Washington, DC 20534

Defendant 8    Transgender Executive Council (TEC)
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534

Defendant 9    Pullen, Timethea
TEC
320 First Street, N.W.
Washington. DC 25534

Defendant 10    Epplin, J.
National Policy and Program Coordinator, FBOP
320 First Street, N.W.
Washington, DC 20534

Defendant 11    Doe 3, John
Director, Women and Special Populations Branch, FBOP
320 First St., N.W.
Washington, DC 20534

Defendant 12    Doe 4, John
Director, Psychology Services Branch, FBOP
320 First St. N.W.
Washington, DC 20534

| | |
|---|---|
| Defendant 13 | Doe 5, John<br>Director, Health Services Division, FBOP<br>320 First St., N.W.<br>Washington, DC 20534 |
| Defendant 14 | Doe 6, John<br>Director, Designation and Sentencing Computation Center, FBOP<br>320 First St., N.W.<br>Washington, DC 20534 |
| Defendant 15 | Doe 7, John<br>Senior Deputy Assistant Director, Health Services, FBOP<br>320 First St., N.W.<br>Washington, DC 20534 |
| Defendant 16 | Doe 8, John<br>Director, Correctional Programs Division, FBOP<br>320 First St., N.W.<br>Washington, DC 20534 |
| Defendant 17 | Federal Detention Center, Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |
| Defendant 18 | Cooper, A<br>Warden, FDC Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |
| Defendant 19 | Bowlin<br>Associate Warden, FDC Seatac; Spec. Pops.<br>2425 S 200th St<br>Seatac, WA 98198 |
| Defendant 20 | Posalski<br>Health Services Administrator, FDC Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |
| Defendant 21 | McGinnis<br>Clinical Director, FDC Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |

| | |
|---|---|
| Defendant 22 | Haynick<br>Chief Psychologist, FDC Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |
| Defendant 23 | Hauss<br>Captain, FDC Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |
| Defendant 24 | McKone<br>Supervisor, Trust Fund, FDC Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |
| Defendant 25 | Rios-Marques, M.<br>Western Regional Director, F-BOP<br>Western Regional Office<br>7338 Shoreline Drive<br>Stockton, CA 95219. |
| Defendant 26 | Doe 9, John<br>Secretary of Homeland Security, USA<br>1600 Pennsylvania Ave. N.W.<br>Washington, DC 20500 |
| Defendant 27 | Thomas<br>Officer, FDC Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |
| Defendant 28 | Federal Detention Center Seatac<br>2425 S. 200th St.<br>Seatac, WA 98198 |

## Count I continual

and life-saving gender-affirming Surgery (GAS) prescribed by my Bureau of Prisons (BOP) provider on 8/13/24 as well as other medically necessary gender dysphoria treatments.

### MY GENDER DYSPHORIA

I am a transgender female with severe gender dysphoria (GD), and I have been in BOP custody since June, 2020 serving a 21-year Sentence. My sex assigned at birth was male, but I identify as female. I began social transitioning to female ten years ago by growing my hair out. Due to fear for my safety, I did not notify the BOP at first. By 2022 I felt more safe and began living fully as female, and staff and inmates recognized me as such. My GD was getting worse, and after multiple suicide attempts I finally notified the BOP that I was transgender so I could get help with treating my GD in 2023. This allowed me to obtain and use female underwear, jumpers, makeup, and have staff refer to me using female pronouns. This has been part of my medically necessary GD treatment since then. I also began medically transitioning in 2023 with hormone replacement therapy (HRT) (I am now post-transition with female secondary sex characteristics and have achieved the maximum benefit possible from social transition, female gender expression and HRT).

These GD treatments had provided some help for my GD, but by 2024 my GD was becoming more severe with increasing suicidality and urges to remove my testicles by self-surgery. The next step in my individualized GD treatment was gender-affirming surgery (GAS) and my BOP medical provider prescribed surgery on 8/13/24. Exhibit G3.

1.3 Prior to my incarceration in 2020, my GD was steadily worsening. My mental health became so bad that in 2018 I lost my job, which I loved as director of a project to create a community-driven, tribal centric behavioral health system for the prevention, treatment, and recovery from substance abuse, mental illness, and related problems. Due to

## Count I

1.3 increasing internalized transphobia and GD, I had a complete mental breakdown, and in 2018 my parents took me in because I had become unable to take care of even my most basic needs. In the years leading to my arrest in 2020, my GD lead to extreme depression, anxiety and suicidality. I was unable to leave my room for two years except for emergencies. During this time my GD was so severe that I attempted suicide several times, began self-medicating with alcohol so my pain would go away, and I was committed to a mental hospital three times.

1.4 Since my BOP incarceration at FDC SeaTac, my severe GD has caused thirty-five Suicide Risk Assessment (SRA) crisis interventions by BOP psychologists, I was committed to suicide watch three times, once in full arm and leg restraints, I had three suicide attempts, and three incidents of self-mutilation. I have very strong urges to kill myself to stop the pain I feel all day every day caused by being in a male body. I constantly feel the urge to remove my own testicles so I can be more female and hopefully reduce the torture I am subjected to every hour of every day. Even my sleep is disrupted by these feelings of intense anxiety, disgust, hopelessness and despair. Despite achieving maximum benefits from living fully as female, including wearing female clothes and grooming items (e.g. make up), psychotherapy, psychiatric treatment, and HRT, my GD remains increasingly severe and life-threatening. Exhibit B 1, 3.

### TIMELINE of EVENTS in the BOP

1.5 5/25/23 BOP transgender documentation.

1.6 12/5/23 Received GD diagnosis and began HRT.

1.7 1/26/24 Suicide Risk Assessment (SRA) crisis intervention by BOP psychologist due to my overwhelming urge to remove my testicles. I requested gender affirming surgery (GAS) at this time.

1.8 Dr. Dy increased my estradiol to max dose and ordered labs and follow-up on [illegible] and [illegible] per guidelines [illegible]

I

1.9 3/26/24 GD evaluation by new Clinical Director Dr. Yeverino-Flores (Dr. Dy retired). Dr. Yeverino-Flores determined "a referral to a specialist would be the best avenue" and he prescribed me to see a GD specialist to further evaluate and manage my GD treatment. This referral was subsequently approved locally and was to be scheduled. Exhibit K₁,₂.

1.10 7/15/24 message to HSA Posalski and new clinical Director Dr. McGinnis stating "I should have had new labs to check my hormone levels and a follow up for HRT." I said I was concerned my potassium levels were not being monitored like they are supposed to since I began taking spironolactone. Spironolactone has the potential to cause life-threatening potassium levels in some patients, and BOP and WPATH Soc 8 guidelines state to check levels every three months. I also said "I am concerned that I have not had the specialty consult that I was referred to for transgender health issues, including HRT."

1.11 7/22/24 message to HSA Posalski and McGinnis requesting GAS and a "formal evaluation and treatment plan for gender-affirming care." I note that I have met all BOP Clinical Guidance and WPATH Soc 8 criteria for GAS, and I state "not being provided this care has been, and continues to be, extremely detrimental to my physical and mental health." Note: I have continued to cut my wrists to stop myself when the urge to kill myself or do my own GAS becomes overwhelming. I have been successful in hiding my cuts by covering them with a watch and handmade bracelets.

1.12 7/27/24 message to Warden Cooper, AW Bowlin, Posalski, McGinnis, and Chief Psychologist Dr. Haynick notifying them "I continue to be denied medically necessary care that continues to cause devastating physical and mental health problems" I again tell them I'm being denied the GD specialist consult to evaluate and treat my GD that my provider prescribed four months earlier. I beg all of them for help.

1.13 7/22/24 message to Cooper stating "access to gender-affirming care as a transgender female is my right and is required by

I

1.13 FBOP policy... and I have not been able to get access to gender-affirming care, including medically necessary treatment of my persistent GD." I tell him I need GAS, and I tell him that my GD had already caused multiple suicide attempts and was currently causing suicidal ideation.

1.14 7/28/24 message to Pullen, Epplin, Doe 3, Doe 4, Doe 5, Doe 6, Doe 7, Doe 8 informing them of my ongoing denial of gender-affirming care by staff at FDC Seatac. I state "Denial of necessary major medical and gender-affirming care has caused unnecessary pain and suffering and many physical and mental health problems. I've lost ALL of my upper teeth and most of my lower teeth during my incarceration here at FDC Seatac..., and the refusal of this place to fix damage to my teeth (receding gums, general decay) caused by the psych meds I was forced to take here (they denied the psych meds that were prescribed by my outside psychiatrist and gave me different meds prescribed by the doctor here) has lead to a complete and irreversible destruction of my oral health. I've attempted suicide three times here at FDC Seatac, and I continue to suffer in many ways due to ongoing denial of gender-affirming care including treatment of my GD." I inform them that I'm also being denied access to a GD specialist my BOP provider prescribed in March, 2024. I tell them that lack of access to appropriate GD treatment was causing me to be "overwhelmed by anxiety, depression and thoughts of self-harm. I attribute all of this to being denied necessary care here at FDC Seatac." I tell them that the harm I've experienced because of this "is complex and is interwoven with other trauma I've experienced here as a transgender female, including being raped and ongoing transphobic treatment by staff." I close begging them to "please help me in any way you are able to. My situation involves clear violation of my rights that have caused clear harm. The BOP policies for providing gender-affirming care are very clear, and my situation involves clear violation of policy

I

1.14 that has caused and continues to cause pain and suffering." Note: These individuals comprise the Transgender Executive Council (TEC) and are each responsible for all transgender issues, including GAS approval, in the BOP.

1.15 8/11/24 message to Pullen, Epplin, Doe3, Doe4, Doe5, Doe6, Doe7, and Doe8 Stating:
"Did you hear back from AW Bowlin or Warden Cooper about my being denied care here at FDC Seatac?" and "What should I do? I'm in my fifth year here at FDC Seatac, and my mental and physical health continue to fester and deteriorate due to lack of access to care."

1.16 Exhibit G. 8/13/25 GD evaluation by traveling BOP medical provider Smith. Smith determined that my GD was severe and required GAS as the next step in my treatment. Smith prescribed GAS at the conclusion of our visit.

1.17 8/22/24 message to Cooper and Bowlin notifying them that I had been prescribed GAS. I inform them that I have met all BOP requirements for GAS. I formally request GAS as required per BOP Clinical Guidance.

1.18 8/22/24 I formally request GAS again to Pullen, Epplin, Doe3, Doe4, Doe5, Doe6, Doe7, and Doe8, and tell them I was prescribed GAS by my BOP provider.

1.19 8/31/24 I submit a PREA report of sexually abusive behavior by Officer Thomas against me. Note: Officer Thomas had been having escalating transphobic behavior towards me. He was disgusted by me and thought it was wrong that I had been prescribed GAS. (he saw me happily talking about my surgery to other inmates and staff).

1.20 9/1/24 Officer Thomas intercepted and destroyed my PREA report and fabricated an incident report, "shot" against me. He had overheard me telling other inmates that I shouldn't have any problems getting my GAS because I didn't have any incident reports. He claimed to see my chest when I was sleeping ~1am.

1.21 9/1/24 message to Cooper and Bowlin that Thomas had fabricated a shot against me in an attempt to prevent my GAS. I told them I had submitted a hand written PREA report

I

in a sealed envelope the previous night, and that Thomas intercepted my report, opened it, and showed it to Officer Higelman at his 6AM end of shift and then destroyed it.

9/1/24 I submitted another PREA report to Cooper. I told Officer Nelson that I needed to speak with an LT about reporting Officer Thomas' sexually abusive behavior.

9/1/24–9/10/24 I submitted 5 administrative remedy formal grievances (bp9s) reporting Thomas, including personally handing one to Lieutenant Hasty. All bp9s "disappeared" and were never documented as required by BOP policy. They never implemented the BOP's required PREA response when an inmate reports a staff.

9/18/24 Cooper and Captain Hauss placed Thomas as the unit officer for my unit with deliberate disregard for my safety. I was sexually harassed by Thomas again and he tried to feel my breasts as a "pat search". I reported this immediately to Haynick, and she initiated the appropriate PREA response and Thomas was removed from my unit. They failed to protect me and follow policy.

9/3/24 message to Pullen, Epplin, Doe3, Doe4, Doe5, Doe6, Doe7, and Doe8 (They failed to protect me as well). telling them about Thomas sexually harassing me.

9/4/24 Dr. Haven, psychiatrist, documented my sexual harassment and that I had been approved for GAS.

9/9/24 message to Cooper asking why I hadn't received receipts or acknowledgments for the bp9s I had submitted. He didn't respond. Note: By this point I had a clear impression that I was being ignored by FDC Seatac staff because I had reported Thomas. In the five years I've been at FDC Seatac, this was the only time I had reported a staff. It was retaliation and transphobic harassment.

9/12/24 message to Bowlin asking for an update on my GAS

9/12/24 Bowlin sent a memo to the TEC requesting approval for my GAS. NOTE: At this point each member of the TEC and the BOP Medical Director had

the authority to approve my GAS.

9/19/25 I submitted a bp9 to Carson reporting Thomas' sexually abusive behavior on 9/18/24. There was never any response or acknowledgment or documentation of my bp9 after Counselor Carson submitted it to the administrative remedy coordinator.          NOTE: At this point I had submitted over ten bp9s attempting to use the grievance process for my GAS, GD specialist, GD treatment and reports of Thomas. Every single bp9 was "lost" and never acknowledged, documented or processed.

10/24/24 SRA by Dr. Harris in response to my suicide crisis.

10/23/24 Bowlin told me at Main Line that the members of the TEC had denied my GAS. He said the reason they gave were that my hormones "weren't on target" and I should "work with Health Services to maximize my hormones." I was shocked, devastated and confused. I told Bowlin I had been the highest possible dose of estradiol since March, 2024 and that my hormones were most definitely on target, but that McGinnis and Posalski and Cooper hadn't ensured my labs or follow ups scheduled for 6/26/24 and 9/26/24 as ordered by Dr. Dy on 3/26/24. This was despite my constant and ongoing requests for labs and a follow up I had been making to Cooper, Bowlin, Posalski and McGinnis since July, 2024. I had repeatedly expressed that my GD treatment wasn't working and I was getting more suicidal and was in extreme distress because of this. All of these individuals were responsible for ensuring I received appropriate GD treatment. Also, Puller, Epplin, Doe3, Doe4, Doe5, Doe6, Doe7, and Doe8 are not clinicians, health care providers, GD specialists or have had any experience in treating GD. Despite this, they inappropriately denied my GAS for a blatantly false claim that my "hormones were not on target." My GAS was prescribed, it was indicated by both BOP Clinical Guidelines and WPATH SoC8, it was the next step in my GD treatment.

I

1.32 it had an excellent chance to alleviate my GD, and they were fully aware I was becoming increasingly suicidal and likely to resort to self-surgery if not given GAS.

1.33 10/24/24 message to Carson asking why I hadn't received any response to my bp9s and asking again to grieve my GD treatment, or lack there of.

1.34 10/25/24 message to Pullen, Epplin, Doe 3, Doe 4, Doe 5, Doe 6, Doe 7, and Doe 8

Following up on being notified of their denial. Some of what I told them include: "It sounds like I am being denied or delayed access to the medically necessary care recommended by my clinical provider as part of the treatment for my GD. I've had ongoing suicidal ideation, suicide attempts, depression, anxiety, self-harm, compulsion to castrate myself, physical and psychological pain and overall extreme distress due to my GD. In 2018-2019, prior to my arrest on June, 2020, I had six suicide attempts and was committed three times to an inpatient mental hospital. All due to complications of my GD. Since my incarceration here in June, 2020 I've had three suicide attempts, twenty-nine suicide risk assessments, nine placements on suicide watch, one crisis intervention to prevent me from cutting off my testicles. I have severe distress and thoughts of suicide every time I look in the mirror and see a man staring back at me... the distress, thoughts of suicide and self harm have not been effectively treated with hormones and psych meds."

1.35 10/26/24 message to Cooper asking for a response to my bp9s and notifying him of my concerns about my GAS denial.

1.36 10/28/24 Epplin tells me I was reviewed by the TEC on 10/11/24 and the members denied my surgery because my hormones weren't on target. NOTE: No legitimate medical or penological reason existed.

1.37 10/28/24 message to the TEC stating that there was a factual error and that I was on the highest dose of estradiol and my hormones were on target. I said "it would be incredibly unfair to deny me this because of inaccurate information. This is an absolutely essential and medically

I

1.37 necessary component of my treatment for GD... this (GAS) is a light at the end of my tunnel that helps me get through the day"

1.38 10/28/24 message to Bowlin Stating "I believe there has been a factual error and my current hormones are on target. They just haven't had labs drawn on 6/24 and 9/24 like the doctor (Dy) ordered. PLEASE help... I've asked for labs for the past months without success"

1.39 10/28/24 Epplin tells me my concerns will be reviewed by members of the TEC. NOTE: The TEC had the authority to approve my surgery at any time, but they were deliberately indifferent to my serious medical needs (DISMN) knowing full well the harm denying GAS was causing me. The BOP Medical Director, Doe 2, also had the authority to approve my GAS.

1.40 10/28/24 SRA by Dr. Harris because my mental health was crashing, I was feeling hopeless and wanted to just end it by killing myself. I was beginning to believe that I was never going to get approval for my GAS because the BOP would always find a way to deny it and FDC staff were working against me.

1.41 11/3/24 message to Carson and Unit Team Manager Lavatai letting them know I still haven't received a response from Cooper about my bp9s. I said "I want to escalate my appeal to the next level if my bp9 appeal was not approved by the warden. What do I do when the warden just doesn't respond?" No response.

1.42 11/8/24 message to Haynick asking for help with my GAS approval. I said "I was referred for medically necessary gender affirming care by my BOP doctors for treatment of my gender dysphoria. As far as I am aware (both legally and according to BOP policy), this is a right, not a privilege, as an AIC of the BOP."

1.43 11/13/24 I spoke with Haynick and Bowlin at Main Line asking for help with my wrongful GAS denial.

1.44 11/14/24 message to Carson about not being able to use the grievance process. I said "I'm reviewing the Administrative Remedy Program Statement, and it states that the AR Clerk is supposed to make a SENTRY Administrative Remedy Index entry as "Date Rcv" for the

1.44 date they receive it in their office. This is for ALL bp9s received, whether or not they are rejected. Each Request or Appeal is assigned a 'Remedy ID'. It is my understanding that my bp9s have not even been entered into the Administrative Remedy Index via SENTRY... I at least need a record in SENTRY that they were submitted in order to be able to appeal to Regional. NOTE: By this time I had already tried to grieve straight to Regional telling them my local bp9s weren't being processed. They dismissed my appeal and said I must first have my bp9 processed locally.

1.45 11/18/24 labs were finally collected.

1.46 11/25/24 Dr. Haven visit. He notes my suicide ideation was resurging due to denial of GAS.

1.47 11/27/24 Clinical Contact with Dr. Harris. She noted "She noted she also recently had bloodwork completed by medical and was optimistic she may still receive gender affirming surgery." NOTE: At this point I believed my GAS would now be approved given that the only reason for the initial denial was now eliminated with proof that Health Services had in fact determined my hormone levels were on target and were maximized.

1.48 12/2/24 message to Bowlin asking him to help prevent further delays with my GAS. Note: Bowlin is responsible for all transgender issues at FDC Seatac, including liasing with Staff and programs to ensure appropriate GD treatment, including GAS, is available. He failed to work with Cooper the TEC and BoP Medical Director, Doe 2 to appropriately approved my GAS.

1.49 12/19/24 Clinical Contact with Dr. Harris. She noted "this writer and Ms. Buckingham processed her thoughts/emotions about her reported belief that she keeps experiencing 'roadblocks' with her gender-affirming surgery."

1.50 12/19/24 I hadn't heard from anybody regarding my GAS since my labs had proved my hormones were 'on target' so I sent a message to Pullen, Epplin, Doe 3, Doe 4, Doe 5, Doe 6, Doe 7, Doe 8

I

1.50 asking them to approve my GAS now that the only reason for their initial denial was now proven unfounded. I also said: "please note that it is recommended against delaying or denying medically necessary gender affirming surgery (GAS) for treatment of GD unless there is a specific medical reason to do so. There is no such medical contraindication for my [GAS], I've met all WPATH and BOP criteria... It has been clearly been shown that denial, delay, or undertreatment of GD in transgender people increases morbidity and mortality, including suicide, self harm (including self surgery), depression, anxiety, and causes many other problems. I've struggled with these issues in the past, and inappropriately delaying this important component of my medically necessary care for my GD is worsening these problems and causing me severe distress." I told them that my overall mental health has continued to worsen since they denied my GAS.

1.51 12/20/24 Epplin informed me that Pullen, Doe3, Doe4, Doe5, Doe6, Doe7, and Doe8
refused to approve my GAS and would not reconsider for at least a year. This was clear DISMN.

1.52 12/20/24 I responded to the TEC stating "I don't believe it is right or legal to unnecessarily deny me access to medically necessary gender affirming care for at least a year for no legitimate reason."

1.53 12/20/24 message to Bowlin stating same as 1.50 and also "I believe that this is unfair, unjust, illegal, and medically negligent."

1.54 12/21/24 message to McGinnis and Posalski, including "Why was I never scheduled for my referred consult to have a transgender specialist to evaluate and manage my gender affirming care? Dr. Yeverino-Flores submitted a new consultation request for this on 3/26/24, but it was never scheduled. Health services here at FDC Seatac have continued to inappropriately and ineffectively manage treatment of my gender dysphoria... Health services providers have consistently told me that they are unable to manage treatment of my gender dysphoria, and my lack of care despite many requests throughout the past year also demonstrates that I am unable to get the

I

medically necessary gender affirming care here that I need to effectively treat my gender dysphoria. I continue to have suicide ideation, urges to self harm (self surgery) depression, anxiety, and other problems related to ineffective treatment of my gender dysphoria. Psychology Services have helped me several times with Suicide Risk Assessments and other support to help me deal with some of this, but I am continuing to mentally deteriorate and need medical help. Please help."

NOTE: Every single medical provider who has worked at FDC Seatac over the past year (2024-2025) has directly told me they had no training or experience in treating GD. Posalski verbally told me in Dec., 2024 when I asked him why I was not being scheduled to see a GD specialist as prescribed, "it's never going to happen. We can handle that in house." I told him there are no providers in house with education or experience and that Dr. McGinnis told me I'm his first GD patient. Posalski said "you aren't going to get what you want." I responded. "it's not 'what I want' its what is indicated by BOP and WPATH guidelines." Posalski denied me access to prescribed treatment. McGinnis and Cooper failed to ensure I have access to competent GD treatment. TEC members directly denied my care and failed to respond appropriately to my messages asking for help because I could not get competent GD evaluation and management (they should have contacted Cooper to create a solution for this.

12/21/24 message to Bowlin stating "I am contacting you about my ongoing denial of access to medically necessary gender affirming medical care, specifically a consultation request by Health Services Provider Dr. Yeverino-Flores on 3/26/24 to a transgender specialist for evaluation and management of my gender dysphoria. I was notified on TRULINKS in March that this was approved, but it was never scheduled. I have continued to mentally deteriorate (increased suicide ideation and urges to self harm) due to ongoing ineffective treatment of my gender dysphoria by Health Services. FDC Seatac has demonstrated in many ways over the past year that they are clearly unable to effectively manage medically necessary care

I

for the treatment of my gender dysphoria. How do I appropriately address my concerns about my lack of access to medically necessary care to appropriately and effectively treat my gender dysphoria. All efforts I've made to date have been stymied. Will you please help me with this?"
NOTE: Bowlin has consistently failed to do his job to make sure I get appropriate help despite knowing the extreme ongoing harm I am experiencing because of being denied access to appropriate help.

12/22/24 message to Posalski including; "my mental health is declining due to ineffective treatment of my GD. During the past 3 months, my Mental Health Care Level has increased, I've had increased suicide ideation and urge to treat myself with self-surgery (I've had multiple suicide risk assessments and contacts with Psychology), and my general mental health is worsening due to ineffectively treated GD. All of the problems with my gender affirming care are causing me severe distress every single day."
NOTE: Posalski was clearly aware of objective signs that my mental health was being harmed, yet he continued to ensure access to appropriate and compent care.

12/23/24 message to Psychology (Haynick) asking for help because I was in crisis, stating "I've been mentally declining due to all the problems trying to get effective treatment of my GD, It seems like one problem after another... the holidays are coming up, and this is another problem I'm not sure I'm going to be able to handle. I feel like I've been struggling to tread water dealing with my self hate over my appearance and my body. My thoughts of suicide and self surgery are getting worse, and I'm worried that I'm being pushed to the point I won't be able to control these urges."

12/23/24 Epplin message to me providing the senior staff positions for each TEC core member. She reminded me " The TEC is the agency's official decision making body on all issues effecting the transgender." This reaffirms that they can deny or approve my GAS and that they should have acted to ensure I had access to appropriate GD treatment and that i was protected from Thomas.

12/23/24 SRA by Dr. Harris. Exhibit H.

1.60 12/26/24 McGinnis gender affirming care evaluation. His EMR entry includes: "In fact, the AIC has expressed some thoughts of self harm about this and was interviewed by Psychology on December 23, 2024." I told him my GD treatment wasn't working and discussed GAS. McGinnis told me again that he didn't have experience with treating GD and was reluctant to make any changes. He noted "I reviewed the AIC's Suicide Risk Assessment on 12/23/24 by Dr. Harris." He also noted "I want to try to find and consult with others in the BoP with more expertise." NOTE: Dr. McGinnis clearly indicates he was aware of my worsening GD and the risk to my life, yet he refused to change my treatment plan because he didn't know what he should do. He noted he intended to consult with a GD specialist, but he refused to follow up with me or change my GD treatment despite the fact it had been unchanged since March and it clearly wasn't working. Exhibit I.

1.61 12/26/24 follow up email from McGinnis. Exhibit J. He again states he doesn't want to make treatment changes because he didn't have the necessary education or experience. He also notes "I also know, from looking at UpToDate, that non-oral forms of estrogen are preferred for people over 40, and you are 46." He also indicates he spoke with a doctor over him at the Regional level but he said there are likely people in the BoP who could advise McGinnis more expertly. NOTE: I've been on oral estradiol since 2023, and I now know that BoP Clinical Guidance and WPATH Sec8 both state oral estradiol is contraindicated for me because of the risk of life threatening blood clots. I had been requesting to switch to injections for months because they are not contraindicated for me. McGinnis knew he could safely switch me from oral to injected estradiol, he knew of the life-threatening risk of not switching to shots, and he refused to make this change. I continued taking oral estradiol as prescribed despite the risk to my life. This is how bad I needed GD help.

1.63 12/28/24 message from McGinnis letting me know he planned on getting advice from the BOP Transgender Clinical Care Team and he would change my treatment asap.

1.64 1/6/25 follow up message responding to McGinnis in 1.60. I hadn't heard anything back. To McGinnis and Posalski: I state "note the multiple, ongoing ways I've been denied effective treatment for serious, medically necessary care to treat my GD for over a year despite clearly established risk to my wellbeing: It has been more than a year without effective treatment of my GD despite My many, many requests for help throughout the year; in March I was referred by my provider to have an outside transgender specialist assume evaluation and treatment of my GD due to lack of in-house providers with the required expertise;... My referral for gender affirming surgery was not approved by the TEC;... please arrange a follow-up visit with me asap to establish a new treatment plan."
NOTE: Posalski continues to refuse to let me see a provider; and McGinnis continues to refuse to change my treatment plan. These are only a couple of the many examples of deliberate indifference to my serious and life-threatening medical needs.

1.65 1/13/25 Clinical Intervention by psychologist Dr. Harris. She documented that I was feeling "frustrated because she is being seen by medical providers that are allegedly not versed in working with the transgender population." NOTE: I continue to reach out for help in every way possible for my GD treatment.

1.66 1/15/25 message to Cooper and Bowlin forwarding 1.61 message and requesting to speak with them about my ongoing denial to access to appropriate GD treatment.

1.67 1/16/25 response to 1.62 by Bowlin indicating they are only in a position to make administrative, not clinical decisions. NOTE: They are trying to ignore my telling them they are not ensuring adequate care or providers are available. That is their jobs. Refusing to do it knowing the harm it causes me is deliberate indifference.

1.68 1/21/25 CCARE Team meeting discussing me. Present were

1.68 Cooper, Aw Grasse, Bowlin, Supervisory Attorney Cho, Chief Psychologist Haynick, Acting Captain Alverado, Pharmacist McMullan, Staff psychologist VanNess, Harris. Their note comments state "overall, no concerns were noted during this CCARE Team meeting." They mention I continue to seek help for GD treatment including GAS. NOTE: Cooper, Bowlin, Haynick should have brought up the fact I was becoming increasingly suicidal, my GD was worsening and the clear issue of not providing access to appropriate GD treatment.

1.69 1/23/25 message to Posalski and McGinnis begging for help. I said "This has been more than a year now. There is no reason it should take this long. I live in torture daily because of my male body and you are not effectively treating my for this. It is treatable, it is medically necessary, it is life-saving, and it is my right [appropriate GD treatment]. You are responsible to help me with this. I've been told for months on end that you are 'working on it.' The doctor referred me to a transgender specialist to manage my care last year in March because he didn't believe he could do it himself, but I was denied this because you said 'we can do this in house.' Another doctor, McGinnis, yet again has said that he is uncomfortable doing it himself because he doesn't know how. Where does that leave me? I need someone to help me.

1.70 1/23/25 I forwarded 1.65 to Cooper telling him I needed help and was at risk to suicide because nobody would help me get appropriate GD treatment.

1.71 1/24/25 Pill Line discussion with Posalski. I asked him why he wasn't letting me see a provider or why they weren't switching me to the shot. He just said "It's not going to happen" I asked who I could talk to because this was a clinical issue and Posalski was not supposed to make clinical decisions. He said the Clinical Director, so I asked how I could talk with him. Posalski said "you can't. I've already told you we aren't changing any thing"

1.72 1/24/25 message to Posalski and McGinnis following up on my conversation in 1.67, again pleading for help. I also said "the doctors here continue

1.72 to express fear and hesitation in providing effective gender affirming medical care... Mr. Posalski, you said Health Services is refusing to see me to address my concerns regarding my gender dysphoria and gender affirming care... This is unacceptable and illegal. It is my right to have access to medically necessary care. As I told you, I desperately need to speak with a clinical provider about my GD symptoms and treatment. I don't know why you are refusing to allow me to do this. Just because Dr. McGinnis is inexperienced in gender affirming care and unwilling to provide me with access to effective medical treatment for my gender dysphoria does not release Health Services from your obligation to provide me with access to gender affirming medical treatment... Please help me."

NOTE: McGinnis, Posalski, Bowlin, Cooper, Pullen, Epplin, Doe3, Doe4, Doe5, Doe6, Doe7, Doe8 were all deliberately indifferent to my serious medical needs by failing to act to ensure I had access to necessary and appropriate GD treatment when they were fully aware of the harm not doing so would cause me. Even worse, they took active steps to deny me access to such care.

1.73 1/24/25 Clinical Intervention by psychologist Dr. Nybo due to concerns about my high suicidality. He noted my suicidal thoughts made worse due to lack of effective GD treatment.

1.74 1/25/25 message to Cooper stating "Please help. HSA Posalski told me on friday that Health Services' 'final word' is that they will not change anything or help me get effective treatment for my GD. Just because the provider(s) here are inexperienced and uncomfortable providing gender affirming HRT does not release Health Services from being required to provide this to me. A doctor referred me to an outside specialist to manage my gender affirming care (including HRT) last March because he was inexperienced and didn't feel he could do it himself. I was never scheduled to see the outside provider and Posalski said it's because 'we do this in house.' Health Services has proven many times over the past year that it is incapable of helping me with this 'in house.' Please help. My mental

1.74 health continues to get worse due to lack of access to effective gender affirming medical care. I am very concerned that whatever resiliance I've had in the past to give me enough of a fight to keep living will soon be gone because I don't see any light at the end of the tunnel in getting the help I need." To Bowlin also.

1.75 1/27/25 message to Posalski and McGinnis and Sick Call stating "I'm having problems with my medical gender transitioning and would like to be seen asap, please." NOTE: Just like all other requests for medical help, this has gone unanswered.

1.76 1/29/25 message to Posalski and McGinnis stating "Will you please give me information about self surgical castration? You've denied me access to effective transgender medical care for over a year now. You refuse to see me to help with my medical transition problems. I was denied GAS... you have formally stated that you are refusing to help me... I'm living in torture every minute of every day. You know this yet you continue to refuse to help me, so self-surgery seems to be the only option to me for any type of medical transition." NOTE: Before sending this message I had decided I couldn't take it any more and was feeling utterly hopeless. I made a rope, figured out how to attach it to my top bunk, and tied it around my neck and let my body sag to the floor. I was hoping that my carotid arteries would get blocked and I would gently pass out. It ended up being very painful so I stood up. I decided that I should at least try self castration before giving up and killing myself. I tried tying a string tight around my testicles to stop the blood flow. I almost started cutting before deciding I should research this first to maximize my chance for success.

1.77 1/29/25 SRA crisis intervention by Harris. She noted: "Ms. Buckingham affirmed her belief that a desire to self castrate is not an act of self harming behavior rather it would assist in her intent to transition into a woman."

1.78 1/31/25 message to Cooper following up on a verbal conversation we had the previous day at Main Line. I told Cooper and a Ms. Taylor, HSA from Region visiting for a couple days, that I

was having a lot of problems with my GD because Health Services would not see me and provide appropriate treatment. I said I was becoming very suicidal. I said "I'm speaking to you (Cooper) because you are the warden and are responsible to ensure AIC have access to necessary medical care, but HSA Posalski told me directly that he would not allow me to see a provider... and the doctor' wouldn't be doing anything else: I told him that I had serious complications related to medical treatment of my GD, but he told me Health Services was not going to see me or do anything different to treat me. Clinical E & M is not in Mr. Posalski's scope of training and licensing; nor is it part of his role as HSA, so I respectively told him (Posalski) that I was having major medical problems and needed to speak with a clinical provider who has the capacity to evaluate and treat patients."

NOTE: Posalski knew of my life-threatening problems. He had the authority to schedule me to see a medical provider. He was, yet again, deliberately indifferent to my serious medical needs by refusing to let me see a provider. Cooper did the same. Western Regional HSA Taylor took my information and said she would make sure I could see a provider, Taylor was also deliberately indifferent to my serious medical needs because I told her I was suicidal and needed to see a medical provider, she had the authority to make it happen but she chose not to do so.

1/31/25 Clinical Intervention EMR by Haynick. "Inmate Buckingham was informed a meeting will be scheduled with medical and Psychology to discuss [my GD treatment]." Despite many follow ups asking Haynick when it was going to happen, Haynick has not arranged this meeting despite having the authority to do so and despite knowing the damage and risk to my well being.

1.80 2/1/25 messages to Cooper, Bowlin, Haynick stating "I just read the bulletin board statement that the BOP will comply with executive order Defending Women from Gender Ideology Extremism and Restoring Biological Truth by removing access to the TEC... I've already been mentally destabilizing due to problems getting the transgender care I need and this is making it worse." I asked for help. Neither Cooper, Bowlin, nor Haynick replied.

1.81 2/4/25 message to Posalski stating "This is in response to you telling me 2/3/25 at pm Pill Line that you will not allow me to see a provider about problems I'm currently having with my medical treatment for GD, stating 'you need to wait until your next Chronic care visit, which won't be for at least another 6 months. Courts have determined that delaying to change individual treatment of GD when it isn't working is considered deliberate indifference of a serious medical need and places the individual with GD at serious risk to their wellbeing (Iglesias v. BOP staff). This has been determined to be a clear violation of the 8th amendment of the constitution, and BOP staff can be held responsible in your individual capacities. Courts have also found that "just because BOP officials provided SOME treatment consistent with WPATH Soc, it does not mean that they have provided constitutionally adequate treatment (De'lonta). My GD treatment isn't working. I'm getting worse and suffer torture every single day. My GD hasn't improved with current treatment and it's been a year, so things clearly need to change. I think of suicide and self surgery daily and it's getting harder for me to control these urges... Doctor McGinnis is the clinical Director here at FDC Seatac, and he told me I'm his first transgender (TG) patient and that he has no training or experience with gender affirming (GA) care. Courts have determined that providing access only to providers without training or experience in GA care is equivalent to denying access. You currently have a doctor from Region (Dr. Rutlidge) with experience in providing GA care who will be here for a couple of weeks, and I am requesting to see this provider for help with my urgent medical problems with my GD treatment. This doctor should

be able to make an adjustment to my current treatment plan given that it has clearly been ineffective for over a year now. Again, courts have clearly established that GD is a serious medical need, failing or delaying to make treatment adjustments when current treatment isn't working, or only providing SOME treatment recommended by WPATH SoC but denying other medically necessary treatment are all violations of the 8th amendment for which BOP staff may be held personally responsible for in your individual capacities. I'm directing this to you personally because several staff have told me that you seem to have a personal vendetta in making sure I can't see a provider for the GD treatment problems I'm having. Please don't deny me this opportunity to see a provider with experience in TG care. FYI, choosing to not change my current treatment, which has clearly been ineffective, based on a limited consult with outside BOP providers is still deliberate indifference because my current treatment clearly isn't working after a year; I continue to get worse, and changing treatment is necessary according to BOP Clinical Guidance and WPATH SoC, which is the current standard of care for TG health in the medical community. Also, even my basic HRT has been inappropriately administered to me. My hormone levels fall outside target therapeutic levels given by BOP Clinical Guidance and the Endocrine Society. My estradiol is too low, and my testosterone is excessively low. In fact, MY CURRENT TREATMENT USING ORAL ESTRADIOL IS CONTRAINDICATED by both BOP Clinical Guidance and WPATH SoC due to my age (>40), putting me at HIGH RISK FOR LIFE-THREATENING THROMBOEMBOLITIC EVENTS. I should be using IM or transdermal - I am respectfully notifying you and requesting help."

NOTE: Posalski had the authority to let me see the traveling provider with GD experience, but he denied me access despite knowing I was high risk for suicide and

1.81 self-castration due to ineffective GD treatment.

1.82 2/21/25 message to Cooper and Bowlin asking why I wasn't able to purchase my medically necessary GD treatment female clothing and makeup. Bowlin responded "undergarments that do not align with an inmate's biological sex will no longer be issued or available for purchase on commissary." NOTE: Wearing female clothing and grooming items had been part of my GD treatment since 2023.

1.83 2/26/25 Clinical Encounter with my psychiatrist, Dr. Haven, MD. NOTE: Doctor Haven has worked closely with me since I arrived in 2020 and knows me very well (over 30 visits). Dr. Haven noted in my EMR "She hadn't been suicidal since 2022, except she has been having more suicidal thoughts as she sees a loss of progress towards her gender transition. Surgery has been delayed and may be cancelled due to EO. She lost the ability to obtain makeup from the commissary due to new rules. She can't buy a bra. She questions now if life is worth living. Thinks more about killing herself... Her gender dysphoria was improving, but now is worsening... resurgence [of suicide ideation] with denial of medically necessary gender affirming care... Recent policy changes are detrimental to her mental health and have increased suicide ideation."

1.84 3/4/25 memo from Cooper stating "individuals will no longer be referred for gender affirming surgeries" in response to my request to schedule an appointment for the surgery I was prescribed 8/13/24. NOTE: This is medically necessary, and Cooper interfered by denying my prescribed treatment, the definition of deliberate indifference to my serious medical needs.

1.85 3/6/25 Psychology GD treatment plan stating "Ms. Buckingham will continue to wear make-up, hair accessories, and clothing that align with her self-identified gender of female. Ms. Buckingham has indicated that being afforded this opportunity has been helpful in alleviating her distress..."

1.86 3/26/25 Cooper memo to me taking away my ability to purchase medically necessary female clothing and grooming items on commissary. I had told Cooper that, for me, these were not cosmetic items but rather life-saving and medically necessary treatment items. Cooper had the authority to allow me to purchase these items. I attempted to purchase these items, but Trust Fund Supervisor Mckone denied my order despite knowing I was suicidal and needed these for my treatment.

1.87 3/26/25 SRA crisis intervention by Harris. She noted "Mr. Buckingham reported that things are feeling more hopeless... he indicated that the cons of living are starting to outweigh the pros... He divulged that he is having recurring thoughts of death and is 'trying to find a reason to live'." NOTE: BOP using male pronuns in EMR. Used to use female.

1.88 4/1/25 I told ARNP Durano at Pill Line that I had been trying to see a provider to get help with my GD and he said "I don't understand why they [Posalski and McGinnis] won't see you." NOTE: It has become common knowledge by staff that I've been suicidal and desperate to see a provider, and that Posalski was actively trying to prevent this. I have had Health Services staff tell me that Posalski is making a point to deny my care.

1.89 4/1/25 message to Posalski and McGinnis stating "I really need help with my GD. It's been over a year now since there have been any changes to my GD treatment plan, and, as I've mentioned many times over the past year, my current GD treatment isn't working. My mental, emotional, and psychological health are continuing to worsen due to inappropriate GD treatment. My thoughts and urges to suicide and self castration continue to get worse, I'm feeling increasingly hopeless, sad, depressed and anxious, and I feel physical pain every time I think about how my body looks, or I see myself in the mirror... My access to appropriate and

1.89 timely GD treatment is medically necessary, it is life-saving, and it is my constitutional right. According to universally accepted GD treatment guidelines by the medical and mental health communities (WPATH Soc-8), and as indicated by my 8/13/24 referral ordered by my FBOP provider in my medical record, surgical GD treatment is required and is the next step in my treatment. The WPATH SOC8 and an abundance of scientific literature make it clear that my GD will not improve without this. It is both of your jobs to ensure that my serious medical conditions are timely and appropriately treated. It is your jobs to ensure that I am not denied life-saving medically necessary care. I am being irreperably harmed and my constitutional rights are being violated each and every day that I don't receive appropriate GD treatment. Please help me."

NOTE: Again, I am doing every thing I can to advocate for myself, e.g. making sure they are aware of my needs, the harm I'm receiving because they are not giving me the care I need, and that they are unlawfully violating my rights.

Individuals Deliberately Indifferent to My Serious Medical Needs and Safety

.90 | 

1.91 Posalski: Began April, 2024 when he refused to schedule my prescribed consultation with a GD specialist despite knowing "in house" treatment was impossible because there were no providers competent to treat GD, and despite knowing I was at high risk of suicide or self-surgery to remove my own testicles if I didn't get appropriate treatment. As stated in my Timeline (1.5-1.89), he has continued to deny me such treatment despite my GD was getting worse and increasingly life-threatening. He denied prescribed GD surgery and multiple prescribed treatments.

1.92 McGinnis: Began 7/15/24 (1.10) when I notified him I was not getting labs or follow up for my GD treatment as prescribed by Dr. Dy on 3/26/24 (1.8). He failed to do his job and ensure my labs and follow up GD treatment. He was aware of my suicide attempts, increasing suicidality and urges to self-castrate, and my declining psychological health. He knew this was due to my GD. As with Posalski, McGinnis denied me access to appropriate GD treatment knowing the harm doing so was causing me. Many specific examples are provided in my Timeline 1.5-1.89. He has denied prescribed treatments such as surgery, female clothing, makeup, voice therapy, etc.)

1.93 Cooper: Began 7/22/24 (1.13) when I informed him I was being denied medically necessary GD treatment and this was putting my life at risk. He was supposed to ensure I had access to such care, and he had the authority to do so but chose not to. Many specific examples provided in Timeline 1.5-1.89.

1.94 Pullen, Epplin, Doe 3, Doe 4, Doe 5, Doe 6, Doe 7, and Doe 8:

Began 7/28/24 (1.14) when I notified them of ongoing unlawful denial of appropriate GD treatment at FDc

1.94 Seatac. I fully informed them how such denial of care was continuing to harm me and was becoming increasingly life-threatening. They each had the authority to ensure I received appropriate GD treatment, and each of them continued to deny me such care (1.5-1.89). On 10/11/24 each of these defendants denied my prescribed GD surgery for no legitimate medical or penological reason. They knew I had met all BOP and WPATH criteria and that my GD would not improve without it. I contacted them many times begging for help because they had the authority to ensure I got appropriate treatment.

1.95 Thomas: Began 9/1/24 when he attempted to block my GAS by fabricating an incident report in an attempt to disqualify me for GAS for punitive reasons. He had heard me telling other inmates that I didn't have any incident reports so the BOP did not have any reason to deny my GAS.

1.96 Haynick: Began 11/8/24 when I asked her for help getting my GAS. Haynick is part of the team that approves GAS

1.97 Bowlin: Began 10/11/24 when the TEC informed him my GAS was denied, and he knew the reason they provided was not legitimate. He has a direct role in approving GAS His job is to deal with all transgender issues at FDC Seatac. My Timeline (1.5-1.84) provides many examples of his deliberate indifference to my serious medical needs and to my safety by failing to protect me from Thomas (1.18-1.22).

1.98 Hauss: Began 9/18/24 when he was deliberately indifferent to my safety by scheduling Thomas to be my unit officer despite my reports on 9/1/24-9/10/24 reporting Thomas' sexually abusive behavior towards me and requesting protection from Thomas because I was scared of what he'd do next.

1.98 He was directly responsible for unit officer scheduling, and he violated BOP policy requiring them to protect me after I reported one of his officers.

1.99 Taylor: Began 1/30/25 when she became aware I was not receiving appropriate care, including being denied access to GD treatment. She told me she would investigate and make sure I get help. She knew I was highly suicidal and high risk of self castration due to lack of appropriate GD treatment. She was a visiting supervisory HSA from Region level. She was above Posalski, and she had the authority to allow me to see a GD specialist as prescribed schedule my GAS, order Posalski to schedule me to see an in-house provider, schedule the prescribed speech therapy and professional hair removal for my GD treatment. She did none of these things knowing the harm denial of such care was causing me.

1.100 Agencies and Official Positions to Implement requested Injunctive Relief:

1.101 FBOP

1.102 FBOP Director

1.103 FBOP Medical Director

1.104 TEC

1.105 FDC Seatac

1.106 FDC Seatac Warden

1.107 FDC Seatac Health Services

1.108 FDC Seatac HSA

1.109 FDC Seatac Clinical Director

1.110 FDC Seatac Psychology Services

1.111 FDC Seatac Chief Psychologist

.112 Trump: 1/20/25 was deliberately indifferent by issuing EO 14168. (3.7),

1.113 BOP Director Doe I was deliberately indifferent by issuing memos on 2/24/25 and 2/28/25 denying all medically necessary GD care, including the purchase of clothes and grooming items. 3.7, 3.8,

Count 1    ~~Facts and Citations page 1~~

1.114  Treatment of GD: Standards

1.115  "Gender Dysphoria is a serious but treatable medical condition. Left untreated, however, it can lead to debilitating distress, depression, impairment of function, substance use, self-surgery to alter one's genitals or secondary sex characteristics, self-injurious behaviors, and even suicide." Edmo v. Corizon, Inc. 2019, 935 F.3d 757 (9th Cir. Appeals).

1.116  WPATH SoC "are the internationally recognized guidelines for the treatment of individuals with GD." Edmo v. Dep't of Corr., 358 F. Supp. 3d 1103, 1111 (D. Idaho 2018).

1.117  Major medical and mental health groups in the United States recognize the "WPATH SoC as the consensus of the medical and mental health communities regarding the appropriate treatment for transgender and gender dysphoric individuals." Edmo v. Corizon, Inc., 2019, 935 F.3d 757 (9th Cir. Appeals).

1.118  The WPATH SoC8 identify the following evidence-based treatment options for individuals with gender dysphoria:
1) "changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity)";
2) "Psychotherapy...";
3) "hormone therapy to feminize or masculinize the body";
4) "surgery to change primary and /or secondary sex characteristics... (for those who have persistent GD) surgery is essential and medically necessary to alleviate

Count 1 ~~facts and citations~~ page 26

1.118 ~~from~~ ~~their~~ their gender dysphoria. That group cannot achieve 'relief from GD... without modification of their primary and/or secondary sex characteristics.'" ~~to establish~~ See also Jae Sevelius & Valerie Jenness, Challenges and Opportunities for Gender-Affirming Healthcare for Transgender Women in Prison, 13 Int'l J. Prisoner Health 32, 36 (2017) ("Negative outcomes such as genital self-harm, including autocastration and autopenectomy, can arise when gender-affirming surgeries are delayed or denied."); George R. Brown & Everett McDuffie, Health Care Policies Addressing Transgender Inmates in Prison Systems in the United States, 15 J. Corr. Health Care 280, 287-88 (2009).

1.119 ~~to~~ My GD will not resolve without the specific treatments recommended by my FBOP health care providers and indicated by the WPATH SoC 8. WPATH SoC 8 chapter 11 provides specific guidance for treating inmates in prison, and they state all recommended treatments apply to inmates.

1.120 ~~to~~ The WPATH SoC 8 provide that "coexisting medical or mental health concerns unrelated to the person's GD do not necessarily preclude surgery. But those concerns need to be managed prior to, or concurrent with, treatment of a person's GD. Coexisting medical or mental issues resulting from a person's GD are not an impediment. ~~Doctor~~ My FBOP psychiatrist, Dr. Haven, MD, clearly states in EMR clinical encounter 2/26/2025 "She had been stable with gradual progress in gender transition. Recent policy changes are detrimental to

1.120 ~~Count I Facts and citations page 7~~ her mental health and have increased suicidal ideation. ~~(EMR page 2 "bother")~~. My mental health concerns are stable, other than those caused by my GD. Exhibit B

1.121 The WPATH Soc 8 apply equally to incarcerated individuals. The National Commission on Correctional Health Care is a leading professional organization in providing health care in correctional settings, and they endorse the WPATH Soc as the accepted standards for GD treatment in prisoners.

1.122 The 9th Circuit court of appeals has found "the broad medical consensus in the area of transgender health care requires providers to individually diagnose, assess, and treat individuals' GD, including for those individuals in institutionalized environments. Treatment can and should include GCS when medically necessary. Failure to follow an appropriate treatment plan can expose transgender individuals to a serious risk of psychological and physical harm. Edmo v. Corizon, Inc 2019, 935 F.3d 757 (9th Cir. Appeals).

1.123 My GD is a sufficiently serious medical need to trigger the State's obligations under the Eighth Amendment. See Rosati v. Igbonoso, 791 F.3d 1037, 1039-40 (9th Cir. 2015); Kosilek, 774 F.3d at 86; Delonta, 708 F.3d at 525; Battista v. Clarke, 645 F.3d 449, 452 (1st Cir. 2011); Allard v. Gomez, 9 F. App'x 793, 794 (9th Cir. 2001); White v. Farrier, 849 F.2d 322, 325 (8th Cir. 1988); Meriwether v. Faulkner, 821 F.2d 408, 412 (7th Cir. 1987); Norsworthy, 87 F. Supp. 3d at 1187; Konitzer v. Frank, 711 F. Supp. 2d 874, 905 (E.D. Wis. 2010).

~~Count I~~

~~Eighth Amendment Claim~~

"Deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. Estelle, 429 U.S. at 104. Because "society takes from prisoners the means to provide for their own needs," Brown, 563 U.S. at 510, the government has an "obligation to provide medical care for those whom it is punishing by incarceration," Estelle, 429 U.S. at 103.

To establish a claim of inadequate medical care, a prisoner must first "show a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Serious medical needs can relate to "physical, dental and mental health." Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).

Gender dysphoria (GD) is a "serious ... medical condition" that causes "clinically significant distress"—distress that impairs or severely limits an individual's ability to function in a meaningful way. DSM-5 at 453, 458. I have provided evidence of my GD being a sufficiently serious medical need to implicate the Eighth Amendment. See Rosati v. Igbinoso, 791 F.3d 1037, 1039-40 (9th Cir. 2015); Kosilek, 774 F.3d at 86; De'lonta, 708 F.3d at 525; Battista v. Clarke, 645 F.3d 449, 452 (1st Cir. 2011); Allard v. Gomez, 9 F. App'x 793, 794 (9th Cir. 2001); White v. Farrier, 849 F.2d 322, 325 (8th Cir. 1988); Meriwether v. Faulkner, 821 F.2d 408, 412 (7th Cir. 1987); Norsworthy, 87 F. Supp. 3d at 1187; Konitzer v. Frank, 711 F. Supp. 2d 874, 905 (E.D. Wis. 2010); Edmo v. Corizon Inc., 935 F.3d 757 (9th Cir. 2019)

If, as here, a prisoner establishes a sufficiently serious medical need that prisoner must then "show the official's response to the need was deliberately indifferent," Jett, 439 F.3d at 1096. An inadvertent or negligent failure to provide adequate medical care is insufficient to establish a claim under the Eighth Amendment. Estelle, 429 U.S. at 105-06; see also Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L. Ed. 2d 811 (1994)("ordinary lack of due care" is insufficient to establish an Eighth Amendment claim). In other words, "medical malpractice does not become a Constitutional violation merely because the victim is a prisoner." Estelle

I

429 U.S. at 106. To "show deliberate indifference, the plaintiff must show that the course of treatment the official chose was medically unacceptable under the circumstances and that the official chose this course in conscious disregard of an excessive risk to the prisoner's health," Hamby v. Hammond, 821 F. 3d 1085, 1092 (9th Cir. 2016).

Medical Necessity of Gender Affirming Surgery for My Individualized GD Treatment:

Given that it has clearly been established that my GD is a serious medical need requiring treatment, I will further prove the medical necessity of the gender-affirming surgery my provider requested on 8/13/24. "Gender dysphoria is a serious but treatable medical condition. Left untreated, however, it can ~~ette~~ lead to debilitating distress, depression, impairment of function, substance use, self-surgery to alter one's genitals or secondary sex characteristics, self-injurious behaviors, and even suicide. Edmo v. Corizon, 935 F. 3d 757 (9th Cir. 2019). The World Professional Association of Transgender Health Standards of Care (WPATH SoC) 8 "are the internationally recognized guidelines for the treatment of individuals with gender ~~dys~~ dysphoria." Edmo v. Idaho Dept. of Corr., 358 F. Supp. 3d 1103, 1111 (D. Idaho 2018). The majority of major medical and mental health groups in the United States, including the American Medical Association, American Psychiatric Association, American Psychological Association and the Endocrine Society recognize the WPATH SoC as representing the consensus of the medical and mental health communities regarding the appropriate treatment for transgender and gender dysphoric individuals. (Edmo).

The WPATH SoC identify the following evidence-based treatment options for GD: (1) "changes in gender ~~role~~ expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity); (2) "psychotherapy ~~(individual, couple, family, or group) for purposes such as exploring gender identity, role and expression, addressing the negative impact of gender dysphoria and stigma on mental health, alleviating internalized transphobia, enhancing social and peer support, improving body image, or promoting resilience, harmone therapy to feminize or masculinize the body; and~~

I

(4) "Surgery to change primary and/or secondary sex characteristics (e.g. breast/chest, external and/or internal genitalia, facial features, body contouring."

The WPATH Soc state that many individuals "find comfort with their gender identity, role and expression without surgery." For others, however, "surgery is essential and medically necessary to alleviate their gender dysphoria." That group cannot achieve "relief from gender dysphoria... without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity." See also Jae Sevelius & Valerie Jenness, Challenges and Opportunities for Gender-Affirming Health care for Transgender Women in Prison, 13 Int'l J. Prisoner Health 32, 36 (2017) ("Negative outcomes such as genital self-harm, including autocastration and autopenectomy, can arise when gender-affirming surgeries are delayed or denied."); George R. Brown & Everett McDuffie, Health Care Policies Addressing Transgender Inmates in Prison Systems in the United States, 15 J. Corr. Health care 280, 287-88 (2009) (describing authors' firsthand knowledge of completed autocastration and/or autopenectomy in six facilities in four states").

The medical and mental health communities agree that GCS is safe, effective, and medically necessary in appropriate circumstances. See, e.g., U.S. Dep't of Health & Human Servs., No. A-13-87, Decision No. 2576, (Dep't Appeals Bd. May 30, 2014); ~~Declara, 108 F.3d at 523 ("Pursuant to the Standards of Care, after~~.

The WPATH SoC8 criteria for ~~surgery~~ gender-affirming surgery include the following: (1) "gender incongruence is marked and sustained; (2) meets diagnostic criteria for gender incongruence prior to gender-affirming surgical interventions in regions where a diagnosis is necessary to access health care; (3) demonstrates the capacity to consent for the specific ~~surgical intervention~~ gender-affirming surgical intervention; ~~on reproduction and they have explored reproductive options; (4)~~ (4) understands the effects of gender-affirming surgical intervention on reproduction and they have explored reproductive options; (5) other possible causes of apparent gender incongruence have been identified and excluded; (6) mental health and physical ~~health~~ conditions that could negatively impact the outcome of gender-affirming surgical intervention have been assessed, with risks and benefits have been discussed; (7) stable on their gender-affirming hormonal treatment regime (which may include at least 6 months of hormone treatment or longer period if required to achieve the

I

desired surgical result, unless hormone therapy is either not desired or medically contraindicated).

Regarding criteria six, the WPATH SOC8 provide that coexisting medical or mental health concerns unrelated to the person's gender dysphoria do not necessarily preclude surgery. But those concerns should be managed prior to, or concurrent with, treatment of a person's gender dysphoria. coexisting medical or mental health issues resulting from a person's gender dysphoria are not an impediment under the sixth criterion. Note my psychiatrist, Dr Haven, notes "She had been stable with gradual progress in gender transition. Recent policy changes are detrimental to her mental health and have increased suicide ideation. Exhibit B page 2 paragraph 4 clinical encounter 2/26/25.

WPATH SOC8 provides recommendations specifically for prisons. Statement 11.1: "We recommend health care professionals responsible for providing gender-affirming care in institutions (or associated with institutions or agencies) recognize the entire list of recommendations of the SOC-8 apply equally to TGD people living in institutions." WPATH SOC8 states "If the assigned health care providers lack the expertise to assess and/or treat gender diverse persons under their charge, outside consultations should be sought from professionals with expertise in the provision of gender-affirming health care. Brömdal, A., Clark, K.A., Hughto, J., DeBattista, J., Phillips, T.M., Mullens, A.B., Gow, J., & Daken, K. (2019) Whole-incarceration-setting approaches to supporting and upholding the rights of incarcerated transgender people. The International Journal of Transgenderism, 2019, 341-350; Sevelius, J., & Jenness, V. (2017) Challenges and opportunities for gender-affirming healthcare for transgender women in prison, International J. of Prisoner Health. See also Note Exhibit G (I was referred for gender affirming surgery 8/13/24). "The consequences of abrupt withdrawal of hormones... include a significant likelihood of negative outcomes (Brown, 2010; Soundsystem and fields v. Frank, 2011) such as surgical self treatment by auto castration, depressed mood, increased gender dysphoria, and/or suicidality (Brown, 2010; Maruri, 2011)" WPATH SOC8. Statement 11.4 states "We recommend staff and professionals charged with providing health care to TGD individuals living in institutions recommend and support gender-affirming surgical treatments in accordance with SOC-8 when sought by the individual, without undue delay".

I

1.136 WPATA SoC8 states "the consequences of denial or lack of access to gender-affirming surgeries for residents residing in institutions who cannot access such care outside of their institutions may be serious, including substantial worsening of gender dysphoria symptoms, depression, anxiety, suicidality, and the possibility of surgical self-treatment (e.g., autocastration or autopenectomy; Brown, 2010; Edmo v. Idaho Department of Corrections, 2020; Maruri, 2011)." Note: The TEC denied my surgery on 10/11/24, and Warden Cooper denied my surgery via memo on 3/4/25. ~~( )~~. Regarding social transition in prison, the WPATA SoC-8, 107, states "to allow for expressing gender identity; these recommendations (11.5) include being allowed to wear gender congruent clothing and hairstyles, to obtain and use gender-appropriate hygiene and grooming products,... and to be addressed by a pronoun consistent to one's identity. These elements of gender expression and social transition, individually or collectively as indicated by the individuals needs; reduce gender dysphoria/incongruence, depression, anxiety, self-harm ideation and behavior, suicidal ideation and attempts (Russell et al., 2018)."

1.137 Edmo v. Corizon finds "the broad medical consensus in the area of transgender health care requires providers to individually diagnose, assess, and treat individuals' gender dysphoria, including for those individuals in institutional environments. Treatment can and should include GCS when medically necessary. Failure to allow an appropriate treatment plan can expose transgender individuals to a serious risk of psychological and physical harm." Note: Exhibit I Dr. McGinnis fails to change treatment plan despite acknowledging increasing suicidality and ineffectiveness of current HRT; Exhibits A, B, D, E, F, J, L

~~My treatment~~ ~~My Individualized GD Treatment:~~
~~I am a transgender female in FBOP custody since June 2020.~~
~~My sex assigned at birth was male, but I identify as female.~~
~~I am serving a 21-year sentence. I viewed myself as female~~
~~and began growing my hair out ten years ago.~~
~~Due to fear for my safety, I did not initially notify the FBOP. My GD~~
~~was worsening, and, after attempting suicide multiple times~~

~~Count Page 12~~

1.138 FBOP Transgender/GD Policies.
The FBOP has published policies specifically addressing transgender and GD issues.

1.139 Transgender Resource Guide, August, 2024 states the following. "It is the policy of the FBOP to provide gender affirming care and support to transgender people in its custody through individualized treatment, management, and/or accommodations, as appropriate." Introduction, 12. "FBOP is required to provide support and necessary treatment options," and it lists some treatment options available, including "Gender-affirming medical care, to include hormones and medical supplies, and gender confirmation surgery." (5). "Employees interacting with transgender people in custody, must use... the pronouns associated with the individual's identified gender." (7). "Clothing and commissary items: Every attempt is made to allow individuals who identify as transgender to dress as their identified gender, regardless of the facility in which they are housed." (9). "Pat searches:... transgender women residing in men's institutions may request 'Female only' pat searches." (11). "Hormone Therapy:... If hormone therapy is medically appropriate for the transgender person, hormone treatment will be provided in accordance with FBOP policy, PS 6031.04 and FBOP Clinical Guidance, Gender-Affirming care of Transgender and Gender Nonbinary Persons." (13)

1,140

~~Count 1    Page 13~~

FBOP Clinical Guidance: Gender-Affirming Care of Transgender and Gender Nonbinary Persons, June, 2023. "Mental Health Concerns and Suicidality: As reported by Valentine, et al (2018), a higher prevalence of depression, anxiety, and suicidality is seen among TG adults compared to the general population. It has been suggested these elevated rates are linked to complex trauma, stigma, violence, and discrimination. A recent study by Baker, et al (2021) suggests that appropriate gender-affirming care, including medical and surgical care, can lesson psychiatric symptoms. Transgender adults with GD are at increased risk of suicidal ideation and suicide prior to initiation of their gender transition, regardless of the clinical endpoint of their transition - whether that endpoint is living as the psychologically identified gender, hormone therapy, cosmetic treatments, breast augmentation/removal, and/or gender-affirming surgery (Wolford-Clevenger et al 2018). For many individuals, the risk of suicide may decrease after receiving the appropriate, individualized treatment (Turben et al 2022)." (4). "Prison Rape Elimination Act (PREA): Per the national PREA Resource center, being transgender is a known risk factor for being sexually victimized in confinement settings." Consequently, PREA regulations and BOP Program Statements provide ways to protect the transgender population." (6). "Gender Dysphoria (GD) criteria:... because untreated or undertreated GD is associated with increased morbidity and mortality

~~Count I  Page 14~~

~~1.38~~ ~~Continued.~~ (Jackson et al 2023), ~~ ~~... Without treatment, this population may experience higher rates of depression, anxiety, self-harm, and suicidality. Gender-affirming treatment supports TG people throughout their lifespan. Treatment modalities are designed to meet the individual's unique goals and may include social supports, mental health treatment, and medical treatment (including hormone therapy and surgery). These interventions may improve medical and psychological health, ~~also~~ increase social support, decrease GD, treat mental health comorbidities, and improve TG individuals' overall quality of life." (8). "Hormone Therapy: Eligibility, Goals, Overview. Hormone therapy is an important part of gender-affirming care." (11). "Minimally Invasive and Non-Invasive Gender Affirming Treatment Modalities. There are several minimally invasive and non-invasive gender-affirming treatment modalities available to TG patients such as voice and communication training, professional ~~and~~ facial hair removal... Lesser invasive or ~~essentially~~ minor surgical procedures may be deemed medically necessary." (22). "Invasive and Complex Gender-Confirming Surgeries. Gender confirming surgery may be medically necessary and is considered on a case-by-case basis. The BOP strives to provide community standard medical and surgical care within the confines of its systems." (23). "While many individuals may not require any surgery, for some it is medically necessary to complete more than a single procedure to alleviate their gender dysphoria/incongruence." (23). I meet all criteria the F BOP lists for surgery (24-25). "Medical Evaluation: ... the medical evaluation will

~~Court I Page 15~~

~~continued~~: address both gender non-binary consolidation medical needs according to WPATH, as well as a general pre-surgical evaluation according to community standard."(26) "Appendix I. Transition Pathway for Transgender Patients: ... After 12 months of living in the identified gender at the gender-affirming institution or the original institution if the TG patient does not request transfer, compliance with continuous gender affirming hormone treatment and with documentation of persistent incongruence, the patient may benefit from lesser/non-invasive gender affirming treatment modalities or invasive/complex gender confirmation surgery." (33).

Providing some GD treatment does not relieve the FBOP from abiding by my Eighth Amendment rights. "If prison officials knowingly refuse to provide medically necessary treatment - even if they provide other treatment consistent with the applicable standards of care - they fail to provide constitutionally adequate treatment." De'lonta, 708 F.3d at 526,7.

FBOP GD surgery protocol: FBOP Clinical Guidance GenderAffirming Care of Transgender and Gender Nonbinary Persons describes the ~~regur~~ requirements and process. ~~As described~~ "After 12 months of living in the identified gender at the gender-affirming institution or original institution if the TG patient does not request transfer, compliance with continuous gender affirming hormone treatment and with documentation of persistent gender incongruence, the patient may benefit from lesser/non-invasive gender affirming treatment modalities

or invasive/complex gender confirmation surgery. For invasive/ complex gender confirmation surgery-the warden at the respective institution will first request administrative review by the TEC. The TEC determines whether administrative criteria for gender confirming surgery is met and refers the case to the Medical Director for a medical review. The Medical Director will request review by the Transgender Utilization Review Advisory Group who will clinically refer the surgical referral packet submitted by the Clinical Director. If the patient meets the clinical criteria for surgery, a memo, with all accompanying clinical supporting materials will be sent to the Medical Director, who is the final authority in approving a patient for referral to the gender confirming Surgeon."

— NOTE: The FBOP has dissolved the TEC and the TURAG in response to EO 14168. It will be impossible for me to get GAS approval through previous process. I will not get GAS without an injunction compelling the BOP to have the Medical Director review my case and approve my GAS unless there is a medical contraindication. The BOP has a history of denying GAS surgeries for no medical or penological reasons. See Iglesias v. Federal Bureau of Prisons, 598 F. Supp. 3d 689, 2022. There, the TEC and the BOP violated a preliminary injunction to provide Iglesias with a surgical consultation for GAS. The court noted, "throughout this litigation the BOP has employed tactics similar to the game of Plinko on The Price is Right... Now BOP's tactics are turning into a game of "Whack-a-mole." Indeed, it appeared the last of the moles had been "whacked." Then another one popped up..." The BOP appears to be playing games with my GAS and GD treatment as well, and this is harming me and risking my life.

1.143 Presidential Executive Order and FBOP Actions

1.144 1/20/25: President Trump issued Executive Order (EO) 14168 "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." This has caused all of my prescribed GD treatments to be cancelled, including: social transitioning accommodations (female clothing and grooming items, female pronouns used by staff), GAS, voice and communication speech therapy, and professional facial hair removal. The FBOP and FDC Seatac has stopped my individualized GD treatment, denying me access to life-saving, medically necessary care and causing me serious and irreparable harm. As part of my GD treatment, I have been wearing female clothing and grooming items (e.g. makeup) for years, and this has been helpful in alleviating my GD somewhat. Trump's EO mandates a categorical, across-the-board ban on GD treatment for adults in custody (AIc) in the FBOP, regardless of medical necessity, or the fact that I was already being provided such care by my FBOP clinicians and depend on this care for my health. It prohibits FBOP health care providers from evaluating and treating GD on a patient-centered individualized basis, according to their professional judgment and generally accepted guidelines.

1.145 2/21/25: FBOP issued a memorandum implementing EO 14168 entitled "Compliance with EO 14168." This specifically prohibits the purchase of "any items that align with transgender ideology"; prohibits granting requests for other accommodations to address GD such as "undergarments that do not align with an inmates biological sex."

1.146 2/28/25: FBOP issued a second memorandum entitled "EO 14168 Compliance," which states that no FBOP funds may be used for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex. A categorical ban on GD treatments is unconstitutional. "A blanket, categorical denial of medically necessary surgery is the paradigm of deliberate indifference." Collwell v. Bannister, 763 F.3d 1060 (9th Cir. 2014).

Injury, Harm, and Damages I Have Suffered

Actions and inactions by each defendant have caused severe and irreparable harm. This harm is ongoing and will continue without injunctive relief.

Denial of appropriate GD treatment has made my life a living hell. I feel extremely depressed, sad and hopeless. I feel overwhelming disgust and anxiety every time I think about how male my body is or I see myself in the mirror. I can't sleep without nightmares. My urge to remove my own testicles is becoming overpowering. I'm actively planning how I can do it with the best chance of success and survival. I've tied off the blood supply to my testicles, but I chickened out and cut my wrist instead so the pain would help me better control myself. My wrist is full of scars from being forced to cut myself to stop spiraling out of control. I wear a watch and bracelets to hide the scars. I feel physical pain like I'm being crushed constantly. I feel like I'm being tortured every hour of every day. Transphobic actions by staff make everything worse.

My BOP psychologists and psychologists have clearly documented that denying appropriate GD treatment is harming my mental health and is a threat to my life. My BOP Mental Health Care Level has increased from a I to a II because of this. I've had increasing SRAs and crisis interventions. Taking away my female clothes, makeup, GAS, voice and communication speech therapy, professional hair removal and access to competant GD treatment providers is literally taking away my will to live and will likely take my life unless I get injunctive relief so I can rightfully receive the GD treatment I need.

Nani Love Buckingham
50205086
Federal Detention Center
PO Box 13960
Seattle, WA 98198

Special
Legal Mail



Clerk, U.S. District Court
Courthouse
700 Stewart St., Suite 2310
Seattle, WA 98198

FILED
LODGED
RECEIVED    MAIL

APR 30 2025

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                    DEPUTY

Envelope 1 of 2